**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on April 02, 2007, which may be different from its entry on the record.**

**IT IS SO ORDERED.**



**Dated: April 02, 2007**

_____
Arthur I. Harris
United States Bankruptcy Judge

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Case No. 06-13070 |
| | ) | |
| ANTHONY ZAYAS and | ) | Chapter 7 |
| GERALDINE ZAYAS, | ) | |
| | ) | Judge Arthur I. Harris |
| Debtors. | ) | |

MEMORANDUM OF OPINION[1]

Before the Court is the United States Trustee's motion to dismiss (Docket #13). The debtors opposed the motion (Docket #20), and the Court held an evidentiary hearing. At issue is whether, considering the totality of the circumstances of the debtors' financial condition, the granting of relief would be an abuse of the provisions of Chapter 7. For the reasons that follow, the motion to dismiss is granted. On or before April 12, 2007, the debtors may file a motion under Bankruptcy Rule 9023 and Fed. R. Civ. P. 59(e) to reinstate their case for purposes of conversion to Chapter 13.

---

[1] This opinion is not intended for official publication.

## JURISDICTION

A motion to dismiss a bankruptcy case is a core proceeding under 28 U.S.C. § 157(b)(2)(A). The Court has jurisdiction over core proceedings under 28 U.S.C. §§ 1334 and 157(a) and Local General Order No. 84, entered on July 16, 1984, by the United States District Court for the Northern District of Ohio.

## FINDINGS OF FACT

Pursuant to Bankruptcy Rule 9014(c) and Bankruptcy Rule 7052, the Court makes the following findings of fact. These findings of fact reflect the Court's weighing of evidence, including consideration of the credibility of the witnesses. "In doing so, the court considered each witness's demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a transcript does not convey tone, attitude, body language, or nuance of expression." *In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court has considered the testimony of all the witnesses, as well as all exhibits admitted into evidence.

The debtors filed their Chapter 7 petition on July 19, 2006. They filed amended schedules B and C on August 18, 2006. The amended schedules show $354,679.63 in assets and $448,917.15 in debt. Of that debt, $372,507.99 is secured debt, $3,782.13 is unsecured priority debt, and $72,681.03 is general

unsecured debt. The debtors filed amended schedules I and J on December 13, 2006, which show $7,867.11 of combined average monthly net income and $7,850.60 of average monthly expenses. A portion of the debtors' 2005 federal income tax return was offered into evidence. It shows an adjusted gross income of $143,309. Mr. Zayas is also currently due over $7,000 in commissions from his previous employer, although these funds may be uncollectible.

The debtors' amended schedules show $448,971.15 in debt. $372,507.99 of their debt is secured by the debtors' residence and two cars. $3,782.13 of their debt consists of unsecured priority claims for unpaid taxes on the their residence and for unpaid federal income taxes. The remaining $72,681.03 is primarily credit card debt, although some is for unpaid medical bills and unpaid utility bills. These debts were incurred primarily for personal, family, or household purposes. Accordingly, the Court finds that the debtors' debts are primarily consumer debts. *See* 11 U.S.C. § 101(8).

The bulk of the debtors' secured debt is owed on their residence. The debtors purchased their home in 1999 for approximately $292,000. They put about $8,000 down, and financed the balance. In schedule A, the debtors value the home at $330,000. They currently owe about $360,000. The debtors testified that they have never missed a payment on their mortgage. At some point, the debtors took

3

06-13070-aih    Doc 31    FILED 04/02/07    ENTERED 04/02/07 14:37:51    Page 3 of 14

out a second mortgage on their home. That mortgage was paid off by one of several refinancings. Based on the original purchase price of the house, the debtors' testimony that they never missed a payment, and the scheduled value of the house, the Court finds that the debtors have taken out all of the equity in their house over the past seven years.

The debtors owe nearly $70,000 in credit card debt. The debtors testified that most of that debt was incurred before Mr. Zayas had a stroke in 2005. Mr. Zayas's stroke did affect the Zayases' finances. While most medical costs were covered by insurance, the debtors owe about $5,500 in medical debts. The stroke's lingering effects also caused Mr. Zayas to lose his job for a few months in 2006. Based on the debtor's testimony, the Court finds that Mr. Zayas's stroke was not the principal cause of the Zayases' financial difficulties.

## CONCLUSIONS OF LAW

The United States Trustee has moved to dismiss the debtors' case for abuse under 11 U.S.C. § 707(b)(3)(B). That provision permits the bankruptcy court to dismiss an individual debtor's case if the debtor's debts are primarily consumer debts and if, considering the "totality of the circumstances of the debtor's financial condition," the granting of relief would be an abuse of the provisions of Chapter 7. The burden of proof rests on the United States Trustee to demonstrate abuse by a

4

preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279 (1991) (preponderance-of-the-evidence standard presumed to be applicable in civil actions between private parties).

Subsection 707(b) was substantially revised by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA). Under former subsection 707(b), the standard for dismissal was "substantial abuse." While the Bankruptcy Code did not define "substantial abuse," the Sixth Circuit had held that "in seeking to curb 'substantial abuse,' Congress meant to deny Chapter 7 relief to the dishonest or non-needy debtor." *In re Behlke*, 358 F.3d 429, 434 (6th Cir. 2004) (quoting *In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989)). Whether granting Chapter 7 relief was a "substantial abuse" was determined from the totality of the circumstances, and a court could find substantial abuse based on either lack of honesty or want of need. *See Behlke*, 358 F.3d at 434.

New subparagraph 707(b)(3)(B) closely tracks the Sixth Circuit's prior precedents by directing the bankruptcy court to consider the "totality of the circumstances of the debtor's financial condition." This suggests that *Krohn* and *Behlke* are still good law, at least to the extent that facts constituting "substantial abuse" under *Krohn* and *Behlke* based on a debtor's "want of need" would also constitute "abuse" under the "totality of the circumstances" of 11 U.S.C.

5

§ 707(b)(3)(B). *See In re Mestemaker*, __ B.R. __, 2007 WL 79306 (Bankr. N.D. Ohio Jan. 10, 2007) (applying *Krohn* and *Behlke* to § 707(b)(3)(B)); *In re Lenton*, __ B.R. __, 2006 WL 3850011 (Bankr. E.D. Pa. Dec. 15, 2006) (noting that pre-BAPCPA cases, including *Krohn*, are still good law).

Therefore, in analyzing the "totality of the circumstances of the debtor's financial condition" to determine whether "abuse" exists under 11 U.S.C. § 707(b)(3)(B), the Court will consider the same factors that the Sixth Circuit established in *Krohn* and *Behlke* for analyzing the "totality of the circumstances" to determine whether "substantial abuse" existed under former subsection 707(b). These factors include: the debtor's "ability to repay his debts out of future earnings," "whether the debtor enjoys a stable source of future income," "whether [the debtor] is eligible for adjustment of his debts through Chapter 13," "whether there are state remedies with the potential to ease [the debtor's] financial predicament," "the degree of relief obtainable through private negotiations," "whether [the debtor's] expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities," and "whether debtor's financial situation is the result of an unforeseen catastrophic event." *Behlke*, 358 F.3d at 434, 437 (citing *Krohn*, 886 F.2d at 126-28).

In addition, while the threshold for "abuse" under amended

6

subsection 707(b) may now be lower than the threshold for "substantial abuse" under former subsection 707(b), it is safe to presume that financial circumstances establishing "substantial abuse" under former subsection 707(b), would naturally and necessarily establish "abuse" under amended subsection 707(b).  Since this Court finds by a preponderance of the evidence that the United States Trustee has established circumstances that would surpass even the higher threshold for "substantial abuse" under former subsection 707(b), the Court need not determine by how much the threshold has been lowered as a result of BAPCPA.

It should also be noted that the standard under subsection 707(b) is whether "the granting of relief would be an abuse of this chapter" – *i.e.*, Chapter 7.  That a debtor may legitimately benefit from or even need relief under Chapter 11 or Chapter 13 has nothing to do with whether "the granting of relief would be an abuse of [Chapter 7]" under subsection 707(b).  For example, a debtor who is burdened with substantial consumer debts but enjoys substantial regular income may legitimately need and obtain relief under Chapter 13.  Nevertheless, the same debtor's ability to pay even just a portion of unsecured debt from the debtor's substantial future earnings over the next five years may well create a situation of abuse, should the debtor instead seek voluntary relief under Chapter 7.

In analyzing "totality of the circumstances . . . of the debtor[s'] financial

7

situation" under 11 U.S.C. § 707(b)(3)(B), a major factor is the debtors' ability to repay a significant portion of their debts out of future earnings. Here, current evidence indicates that the debtors should enjoy a stable source of income over the next five years. While no one can guarantee that the debtors will enjoy stable income for the foreseeable future, Mrs. Zayas has been employed at Progressive Insurance for over eight years, and Mr. Zayas, while briefly unemployed following his stroke, is currently employed and earning more than $3,700 per month as an account executive for M&I Bank. In December, the debtors filed an amended Schedule I, which reflects an increase in Mr. Zayas's income postpetition. The debtors' amended Schedule I indicates that the debtors have gross wages totaling more than $10,000 per month or $120,000 per year. This figure is well-above $65,126[2] – the median family income in Ohio for a family of four, a figure used for purposes of 11 U.S.C. § 707(b)(2) and Form B22A. Although Mr. Zayas had a stroke in 2005, he has successfully returned to employment, and the debtors have offered no medical evidence to suggest that his condition is likely to recur or cause a future reduction or interruption in his income. In short, there is no evidence that

---

[2] This is the median income figure posted as of April 2, 2007, at the U.S. Trustee website *http://www.usdoj.gov/ust/eo/bapcpa/20060213/bci_data/median_income_table.htm* for Ohio residents with a family size of four, who filed cases between February 13, 2006, and September 30, 2006.

8

would lead the Court to conclude that the debtors' current income will likely change for the worse in the foreseeable future.

Should the debtors' financial circumstances take a significant turn for the worse at some point in the future, relief under Chapter 7 may well be appropriate at that time. Similarly, should the debtors elect to convert their current case to a case under Chapter 13, and should their circumstances change at some point in the future, the debtors would have additional options at that time. Such options might include: reconversion to Chapter 7 and a discharge under section 727, a hardship discharge under section 1328, or modification of their Chapter 13 plan under section 1329.

While the precise amount that the debtors would be able to pay in a Chapter 13 case is uncertain, the debtors are certainly eligible for adjustment of their debts through Chapter 13. And, as explained below, the Court concludes that the debtors could fund a Chapter 13 plan that paid general unsecured creditors at least $167 per month for 60 months, the threshold for determining abuse under 11 U.S.C. § 707(b)(2), without depriving the debtors of adequate food, clothing, shelter, and other necessities.

The Court acknowledges that it may not be feasible for the debtors to keep their current home, with its mortgage, tax, and interest payments in excess of

9

$3,000 per month.³ Nevertheless, the debtors' current housing costs are substantially higher than the applicable Local Housing and Utility Standard in Cuyahoga County, Ohio, for a family of four of $1,516.⁴ As the Sixth Circuit has noted, a factor in the totality of the circumstances is "whether [the debtors'] expenses can be reduced significantly without depriving [them] of adequate food, clothing, shelter and other necessities." *Behlke*, 358 F.3d at 434.

The debtors could significantly reduce their expenses to fund a Chapter 13 plan by moving to a more affordable home. Even a home with monthly housing and utility costs of $2,516 – *i.e.*, $1,000 above the applicable Local Housing and Utilities Standard for Cuyahoga County – would result in a substantial reduction in the debtors' expenses.

Although no party offered any evidence as to whether the debtors' first mortgage holder would accept a deed in lieu of foreclosure, the debtors testified

---

³ This figure does not include the debtors' current monthly expenses for utilities, which include: $351 for electricity and heating fuel , $83 for water and sewer, $67 for telephone, and $120 for cable TV and Internet.

⁴ This equals the total of the non-mortgage component ($505) and the mortgage/rent component ($1,011) of the Local Housing and Utility Standards posted as of April 2, 2007, at the U.S. Trustee website
*http://www.usdoj.gov/ust/eo/bapcpa/20060213/bci_data/housing_charts/irs_housing_charts_OH.htm*
for residents of Cuyahoga County, Ohio, with a family size of four, who filed cases between February 13, 2006, and September 30, 2006.

10

and their counsel argued that surrendering their current residence would result in a large deficiency balance.  That may be, but it does not settle the matter.  First, this argument neglects the fact that the debtors' predicament concerning their house is largely of their own making.  They purchased the house for $292,000, financing about $284,000.  Even if the debtors had been paying interest-only payments since they purchased the house, they would now have over $40,000 in equity due to appreciation.  Instead, they repeatedly refinanced, each time drawing down all or nearly all of the equity due to appreciation.  Now that real estate prices have fallen, they owe more than their house is worth.  Even if the debtors owe $30,000 more on their mortgage than their house is worth, they could still pay a substantial dividend to unsecured creditors by surrendering the house, should the mortgage holder not accept a deed in lieu of foreclosure.  With a $30,000 deficiency claim, the debtors would owe about $102,000 in general unsecured debt.  If the debtors had a Chapter 13 plan that paid general unsecured creditors as little as $167 per month for 60 months, the threshold for determining abuse under 11 U.S.C. § 707(b)(2), these creditors would receive a dividend of about 10 percent.

Of course, the debtors would prefer not to surrender their residence.  But the debtors do not have a right to live in the house of their choosing at the expense of their unsecured creditors.  *Cf. In re Mooney*, 313 B.R. 709, 714-15 (Bankr. N.D.

Ohio 2004) ("[I]f the mortgage payment on [a] home is so large that a debtor falls behind in payments to other creditors, eventually seeking to discharge most of these debts in Chapter 7, *while still keeping the house*, this would be a substantial abuse of the provisions of Chapter 7.") (emphasis in original). The house requires over $3,000 per month to own, consumes nearly half of the debtors' monthly income, and, as the debtors testified, is larger than the debtors need. Surrendering such a house and reducing housing and utility costs to $2,516 per month, a figure $1,000 higher than the applicable Local Standard for Housing and Utilities, could hardly be described as austere. Indeed, based on the figures the debtors entered on amended Form B22A, the debtors' income is nearly twice that of the median income for a family of four in Ohio. As described above, the debtors have ample income to secure adequate housing and still make a significant payment to unsecured creditors over the next five years.

The Court acknowledges that the debtors' financial condition was adversely affected by Mr. Zayas's stroke. As noted above, the debtors owe some medical debts, and Mr. Zayas was briefly unemployed during 2006. While the stroke was financially damaging, it was not devastating. Mr. Zayas successfully returned to employment, and the debtors have offered no medical evidence to suggest that his condition is likely to recur or cause a future reduction or interruption in his income.

In addition, the debtors testified that they incurred most of their credit card debt before the stroke. This is consistent with the debtors' Schedule F, which indicates that their credit card debt largely preceded the time of Mr. Zayas's stroke. Nor did the debtors submit any evidence such as credit card statements prior to Mr. Zayas's stroke to suggest that their current financial difficulties were of recent origin or the result of an unforeseen catastrophic event. Rather the evidence supports the conclusion that the debtors' financial condition resulted primarily from their continuously living beyond their means; it is not the result of unforeseen circumstances.

In sum, the debtors are able to pay a portion of their debts out of future income. The debtors can expect to continue to earn considerably more than the median income in Ohio. They can substantially reduce their expenses, especially their housing expenses, without being deprived of adequate housing, food, clothing, or other necessities. Their financial condition is not primarily the result of unforeseen circumstances. Under the totality of the circumstances, the granting of relief would be an abuse of the provisions of Chapter 7.

## CONCLUSION

For the foregoing reasons, the United States Trustee's motion to dismiss (Docket #13) is granted, and the case is dismissed. On or before April 12, 2007,

the debtors may file a motion under Bankruptcy Rule 9023 and Fed. R. Civ. P. 59(e) to reinstate their case for purposes of conversion to Chapter 13.

IT IS SO ORDERED.

14

06-13070-aih    Doc 31    FILED 04/02/07    ENTERED 04/02/07 14:37:51    Page 14 of 14